**UNITED STATES of America, Plaintiff,**

v.

**Edward JONES and Warren Lloyd Rogers, Defendants.**

**No. 37161.**

United States District Court
N. D. California, S. D.

May 24, 1960.

Lynn Gillard, U. S. Atty., and John Kaplan, Asst. U. S. Atty., San Francisco, Cal., for the United States.

Allen E. Anderson and David B. Birenbaum, of Birenbaum, Anderson & McClelland, San Francisco, Cal., for defendants Jones and Rogers.

SWEIGERT, District Judge.

Defendant Rogers, a twenty-three year old United States Army private first class, has been indicted in this district for violation of Title 21 U.S.C.A. § 174, which defines as a crime the unlawful importation of narcotics into the United States, and includes therein any conspiracy committed incidental thereto.

Relating to this indictment, defendant has by petition moved this Court to suppress certain statements and to quash a warrant for his arrest, issued on the basis thereof, and upon oral hearing of such motions, has moved as well to quash the indictment.

From the evidence introduced at the hearing on May 4, 1960, the Court finds the facts to be substantially as follows:

On March 9, 1960, about noon, defendant Rogers, returning from Korea aboard the United States Army Transport Mitchell, was halted as he was debarking at the Oakland Army Terminal by United States Customs Officers, acting on information wired to the Army from Korea, and relayed to Customs, to the effect that two soldiers aboard the vessel—one Jones and one Rogers—were in possession of heroin, and that Jones was to deliver it to Rogers on arrival at Oakland.

The Customs officers were assisted at the time by an Army CID officer who identified defendant Rogers as he debarked. Thereupon, the Customs officers, one of whom had taken defendant by the elbow at the gangplank, took defendant's baggage from him, and escorted him to a United States Customs vehicle, and drove him to Military Police Headquarters at Oakland Army Terminal, approximately one-half mile away, for the purpose of searching his baggage and his person.

Defendant's query as to the reason for his detention was answered to the effect that he was suspected of possessing unlawfully imported narcotics and that his detention was for the purpose of search.

Prior to the search, the Army CID officer read defendant Article 31, Uniform Code of Military Justice, 10 U.S.C.A. § 831, concerning the right of defendant to refrain from making statements self-incriminatory in nature and the possible use of any such statements against him. Likewise, a Customs officer informed defendant of his similar right under the Fifth Amendment, and also of his right to counsel. To this defendant replied something to the effect that he did not need the services of counsel, since he had not done anything.

The search of defendant's baggage disclosed a paper containing a reference to Jones, but otherwise revealed nothing. A subsequent strip search of defendant's person was also unrevealing. The defendant acquiesced in the search, admitted he knew Jones, but disclaimed any involvement with narcotics.

After a questioning period of about one hour and a half, the Army CID officer suggested a lie detector test. Defendant acquiesced, and was taken by Customs automobile, accompanied by both Customs officers and the Army CID officer, to the San Francisco Presidio where such a test was given by United States Army personnel.

After the lie detector test, defendant was returned to the Oakland Terminal. Upon arrival there, about 6 P.M., the Customs officers departed, but the Army CID officer, defendant's military superior, arranged for defendant's dinner after regular hours, and told him to await further questioning. This officer did again question defendant for about one-half hour in the evning, and merely told him to remain on the Terminal base. The defendant was not otherwise restrained of his liberty.

The following morning, March 10th, the Army CID officer visited the defendant at his billet, told him to remain in the general area to be available for the further questions which followed between the two for about one-half hour in the early afternoon. No Customs agents were present on this day.

On March 11th, pursuant to new information received from Japan, concerning the supplier of the heroin, one Balthazar, Customs agents came to the base to interrogate defendant further. After having consented to answer further questions, and having once again been advised of his Fifth Amendment rights, the defendant made oral statements admitting that, prior to his departure from the Orient, he had introduced Jones to Balthazar. According to the testimony of defendant and others, this oral statement, given on March 11th, was substantially the same as the written statement ultimately signed by defendant on March 14th (Exhibit 6 herein). A complaint was sworn out and a warrant issued, and on March 15th defendant was arrested on the pending charge.

At no time prior to the service of the arrest warrant upon the defendant did any investigating officer indicate that the defendant was under arrest. In fact, the record discloses that the Customs officers had no intention to arrest defendant when they took him to be searched, nor did the Army CID officer when he restricted him to the confines of the base to facilitate investigation.

The detention by Customs officers was for the purpose of search, and the detention by military authorities was for the purpose of investigation.

The question presented is whether such detentions constitute an "arrest" within the meaning of Rule 5(a), Federal Rules of Criminal Procedure, 18 U.S.C.A., and whether the defendant's statements, oral and written, are inadmissible into evidence because rendered during a period of unlawful detention, under the rule of Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479; Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100; McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

These cases establish the rule that detention of a person is unlawful to the extent that officers, making an arrest, fail to take the arrested person without unnecessary delay before the nearest available United States Commissioner or other officer empowered to commit persons charged with offenses against the United States, as provided by Rule 5(a), Federal Rules of Criminal Procedure; that delay is unnecessary if more than the interval between arrest and the ordinary administrative steps required to bring the suspect before the nearest available magistrate elapses; that although circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third persons, the delay must not be of a nature to give opportunity for the extraction of a confession; that such statements, made during a period of illegal detention due to failure promptly to carry a prisoner before a committing magistrate, are inadmissible in evidence, regardless of whether they are the result of torture, physical or psychological. See, generally, Mallory, supra; Upshaw, supra; McNabb, supra.

█ So far as the actions of the United States Customs officials are concerned, their search and related inquiries were clearly within the lawful powers

of Customs authorities. The source of such authority, as was exercised by the Customs officers, is Title 19 U.S.C.A. §§ 482, 1582. These sections give broad power of detention for search to prevent the importation of noxious and odious goods and substances into the country. Courts interpreting these statutory provisions have traditionally accorded Customs officials reasonably wide latitude to enforce United States Customs laws and regulations effectively. See the very able opinion of Judge Oliver Carter of this Court in United States v. Yee Ngee How, D.C.Cal.1952, 105 F.Supp. 517.

We conclude that defendant's detention incidental to the Customs search did not constitute an arrest or unlawful detention. This conclusion does not ignore the fact that defendant was taken approximately one-half mile from the pier for the purpose of the search. A proper search could not have been performed on the pier itself, but only in the privacy which a room nearby the pier affords. The lack of convenient and immediate searching facilities on the pier itself, should not invalidate a lawful regulatory measure, nor frustrate the objective of our Customs laws.

At the end of the search, and the incidental questioning, the power of the Customs officials terminated. Defendant's contacts with Customs authorities after this time, and up to the moment of his arrest by them, were insignificant in nature (e. g., the transportation service afforded defendant and the Army CID officer from the Oakland Army Terminal to the San Francisco Presidio and back again on March 9th) or were with the consent of the defendant (e. g., the brief questioning of defendant on March 11th). These circumstances do not amount to unlawful detention by Customs authorities after the initial search.

Turning now to the detention of defendant by the United States Army, we note that at no time was defendant physically deprived of his liberty in the sense of being imprisoned, locked in a room, or even confined to his barracks. His detention amounted merely to a restriction to a sizeable military installation on which he had easy access to public telephones, cinematic theatres, bowling alleys, and even beer halls.

Such a detention arising out of military authority and practice to which defendant, as an enlisted man, was already subject does not amount to an arrest within the meaning of Rule 5(a) and the cases, previously cited, which interpret it. In a similar situation, United States v. Bayer, 1947, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654, rehearing denied 1947, 332 U.S. 785, 68 S.Ct. 29, 92 L.Ed. 368, it was considered that, where a regular member of the armed forces is placed in administrative restriction to the extent of confinement to a military base, "such a limitation * * * of one in the Army and subject to military discipline is not enough to make a confession voluntarily given after fair warning invalid as evidence against him." 331 U.S. at page 541, 67 S.Ct. at page 1398.

Under military law, which has been described as a jurisprudence existing "separate and apart from the law which governs in our federal judicial establishment," Burns v. Wilson, 1953, 346 U.S. 137, 140, 73 S.Ct. 1045, 1047, 97 L.Ed. 1508, there is no analogue to Rule 5(a), Federal Rules of Criminal Procedure, which requires prompt arraignment. Evidence received during a period of unnecessary delay following an arrest may be introduced into evidence in a court-martial, Burns v. Wilson, supra, for the reason that the McNabb rule is merely a federal evidentiary rule, the source of which is, not federal due process, but the United States Supreme Court's power of "supervision of the administration of criminal justice in the federal courts." McNabb v. United States, supra, 318 U.S. at page 340, 63 S.Ct. at page 613.

While, therefore, military legal standards have no precise application here, it may at least be observed that even under

military law, defendant's restriction to base limits would not amount to an arrest. The Uniform Code of Military Justice, 10 U.S.C.A. § 801 et seq., contains definitions and standards relating to arrest. Article 7, U.C.M.J., 10 U.S.C.A. § 807, defines "apprehension" as the "taking of a person into custody." Article 9, U.C.M.J., 10 U.S.C.A. § 809, defines "arrest" as the "restraint of a person by an order, not imposed as a punishment for an offense, directing him to remain within certain specified limits."

While Article 7 is inapplicable for the reason that defendant was not in custody during the time in question, such terminology, as contained in Article 9, is sufficiently broad to embrace the type of administrative restriction here present. Yet, the accepted interpretation of such section indicates that it does not pertain to an administrative restriction of a military person such as defendant Rogers here, pending completion of an investigation, but rather a detention in the nature of an arrest resulting from preference of charges by proper authority against the accused military member with a view to the convention of a court martial. See, United States v. Smith, 1905, 197 U.S. 386, 25 S.Ct. 489, 49 L. Ed. 801; Bishop v. United States, 1905, 197 U.S. 334, 25 S.Ct. 440, 49 L.Ed. 780; Johnson v. Sayre, 1895, 158 U.S. 109, 15 S.Ct. 773, 39 L.Ed. 914.

Because the detention of defendant by both Customs and military officers was lawful, within their respective spheres, the detention as a whole must be considered lawful. A voluntary confession made by a defendant while in lawful detention is not subject to exclusion from evidence under the authority of the McNabb-Mallory rule. See: United States v. Carignan, 1951, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48.

Defendant contends that the military authorities were in this instance acting in collusion with Customs authorities, and that, since United States Customs agents could not have legally held defendant without bringing him before a magistrate for the duration of time here involved, they should not be allowed to use the United States Army military authority as a convenient instrument for procuring evidence later to be used in a federal prosecution in a United States District Court.

Defendant relies on United States v. Tupper, D.C.W.D.Mo.1958, 168 F.Supp. 907, wherein it appeared that, pursuant to a "working arrangement" between state and federal officers, the state officers would, subsequent to arrest, detention and search (which could be in violation of federal law were these acts performed by federal agents) release such accused persons to federal officers for prosecution. The District Court, citing Anderson v. United States, 1943, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829, concluded that sufficient collaboration of state and federal authorities existed to make such state police conduct in effect the conduct of federal authorities.

Testimony was received from the Army CID officer to the effect that although he, at least, was unaware of any plans to court-martial defendant, that, although there is an Army policy to turn over such an accused to the United States Customs authorities, the Army's case was not closed, and that his report had been completed and sent to Washington, D. C., presumably to United States Army Headquarters for further disposition.

Testimony was also received from the same Army CID officer to the effect that the United States Army has its own, considerable interest in any case involving Army personnel, especially where the possession of narcotics by military personnel is involved. This is understandable, because traffic in addicting drugs may tend to undermine the moral fiber, good order and discipline required to maintain an effective fighting force. Conceivably, the defendant may still be prosecuted under military law. See, Article 134, U.C.M.J., 10 U.S.C.A. § 934, relating to "disorders and neglects to

the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty." Also, Article 81, U.C.M.J., 10 U.S.C.A. § 881, relating to conspiracy to commit any offense under that chapter.

There was no testimony that military proceedings had terminated, or that it is customary practice to decline military prosecution following the turning over of such defendants to civilian authorities. We are, in fact, aware of cases to the contrary. United States ex rel. Pasela v. Fenno, D.C.Conn.1947, 76 F. Supp. 203, affirmed 2 Cir., 1948, 167 F.2d 593, certiorari dismissed 1948, 335 U.S. 806, 69 S.Ct. 29, 93 L.Ed. 363; In re Stubbs, C.C.Wash.1905, 133 F. 1012. See also, United States v. Maney, C.C.Minn. 1894, 61 F. 140.

We, therefore, conclude that while the civilian and military authorities may have conducted their detentions of defendant, such as they were, cooperatively, that they acted nonetheless for separate purposes and that no such collusion or joint operation existed here as would justify the application of the principle contained in United States v. Tupper, supra. See, White v. United States, 5 Cir., 1952, 200 F.2d 509; Brown v. United States, 5 Cir., 1955, 228 F.2d 286.

For the foregoing reasons, and for the further reason that there appears here no indication that the statements in question were induced through violence, or threats of violence, persistent questioning, deprivation of food or rest, or any physical or psychological coercion,—we conclude that defendant's motions to suppress, quash the arrest, and to quash the indictment should be denied.

Plaintiff will prepare an order in accordance with this opinion and submit same for the Court's approval within five days of the date of this filing, as provided by the Rules of this Court, General Rule 21, West's Ann.Code.